Good morning, Your Honor. May it please the Court, my name is Robert Sanook and I represent Mitchell Stein, the appellant in this matter. I would like to reserve three minutes of my time for rebuttal, if that's okay. Mr. Stein appeals the lower court's summary judgment order based on an incorrect application of law. The summary judgment order was granted while there were pending motions for discovery, which would have revealed exculpatory information. It was based also on a lack of any evidentiary hearings and solely on a legal argument of collateral estoppel arising out of a criminal conviction in Miami, Florida, involving Mr. Stein. That criminal conviction does not support the collateral estoppel argument as it was a general verdict, not with specific findings, was not identical on the merits, did not involve all litigated issues, and most glaringly was a polar opposite factually to the results and the argument made by the SEC in its summary judgment motion. The SEC's arguments were based on a the existence of a contract and a check, which the DOJ and the ---- But in the ultimately in the trial, although the trial seemed to begin on the assumption that there was no document relating to the first order, I read the closing argument and it seemed to me that the argument was pretty parallel to what's alleged here, i.e., that this individual, there was a purchase order from this individual or a document that purported to be, but it wasn't for the CHM that was put in later, and that it would then continue with this false entity. So I didn't really see that it would begin on a different theory, but it didn't end up on a different theory. Your Honor is correct on the factual basis, but the underlying premise on collateral estoppel requires that there have to be identical issues, not a general verdict or a general idea. But that's a different question, and I would like to talk about that. It does seem true that the jury could have, I believe the jury in the criminal case could have said, well, we don't believe the SEC's, the prosecution as to the first purchase order, but we do believe them about the second two purchase orders, and so we're going to find them guilty on the 10b-5 and so on. Now, would it matter to the civil case whether that happened, i.e., could the civil case go forward on the same basis? It matters. It's inextricably tied to that. The subsequent purchase orders are supported by the one order that they denied ever existed. So the subsequent purchase orders are part and parcel of that. Kagan. I'm talking about the subsequent purchase orders and the two other instances, the IT thing. The IT purchase order, Hartronics. Well, the Supreme Court made it very clear on this matter. General verdicts. We can't guess here. We're not here to say in a summary judgment motion. Well, it only matters what matters to the civil trial. In other words, if the finding that was made in the criminal trial is sufficient to support the judgment in the civil trial, then it's identical for those purposes. But if on the other hand, for example, in the civil trial, does it matter whether each of the three alleged phony purchase orders or purchase sequences existed for purposes of the ultimate disgorgement or fines, or does it or is it okay if two of them existed? That's the point, Judge. We don't know that. No, no, what? I'm asking you legally and conceptually, does the civil trial, civil result depend on there being three different incidences or would two be enough or one be enough? In accordance with the Supreme Court's ruling, it definitely requires that. The Supreme Court has said the general verdicts do not support it. You're not answering my question, but that's fine. If you don't want to, don't. The Supreme Court said you cannot support a collateral estoppel argument with a general criminal verdict. Well, you can if the general verdict decides the fact that the civil case turns on. I mean, if the general verdict is that this person murdered Jones and the only thing that matters in the civil trial is whether he murdered Jones, that's good enough, even though if they don't find that he murdered Jones, if all that went to them is did he murder Jones. Does it matter if he murdered with five stab wounds or three? I can't compare a murder to a civil white-collar crime conviction, especially when the general verdict made no findings of fact, concluded nothing as to which the jury relied on or didn't rely on. You have to tell me, in order to make that matter, what was necessary to the hold up of the civil trial? The civil trial alleged that there was the existence in the civil matter of a contract which the criminal trial denied ever existed. Those are polar opposites. Does that matter to the result in the civil trial, though? I think it certainly does. I think it certainly does. Why? Because if there is a contract and it's based upon fraud, which the criminal trial said that fraud was the absence of a contract, then it's certainly a different result. If there is no contract in one case and they use that as a basis for fraud, but it does exist then. But if the same verdict follows in the civil trial, i.e., he violated 10b-5 and he owes $10 million, whether there was a contract which evolved into a fraud or there was a fraudulent contract, it doesn't matter. It has to be material in some fashion. It can't simply be a difference. It doesn't matter. Well, I would think that the truth does matter. And if the truth here. No, but this is the sort of that same distinction without a difference. So are you making distinctions without a difference? I think what, you know, so because you can always find something that it's a little bit like in cases in precedent. All the facts are exactly the same, but in one the person was wearing a red shirt and the other they were wearing a blue shirt. So then you say, well, we distinguish the case because a red shirt and a blue shirt doesn't matter. So distinctions without a difference aren't going to help you here. Yeah, I think there is a distinction with a difference here because the SEC in its summary judgment motion where they didn't allege any evidence. They just simply said he was convicted in Florida. They stated I can't tell you here today what the truth is. We are not truth finders at the SEC. So they're admitting that they're. All they were saying is that they're not saying, you know, what's the truth. They're telling you what he was convicted of. No, they're saying that our allegations represented a material fact that is an opposite of what happened at the criminal case. And that material fact was the existence of a check and a contract, which the underlying criminal action said didn't exist. But it was ultimately stipulated in, as I understand it, in the criminal case, that there was a check and a contract. It was not. It was not. In fact, the prosecutors in the criminal case denied the existence of it, raised hearsay objections. And in the discovery motions that were still pending before the civil matter, and those discovery motions was a body of interviews with the individuals that even the prosecutors in the DOJ cases, the criminal case, said never existed. And there's documents, 200 million pages of documents that were not provided. And those came off Hartronics hard drives, is that right? And which Hartronics still has access to. No. Hartronics didn't have access to the 200 million database of the SEC. The SEC gave to the prosecutors 2 million pages, which were unsearchable. It's been represented, I can ask, and they could not be telling the truth. But it is represented in the brief that the company did have access to the whole 200 million documents because it came off their hard drive. Well, the company may have, but Mr. Stein certainly didn't. He was excised from the company and didn't have access to it. That's a Giglio-Brady analysis which the Court's already accepted and is now resentencing. So at the heart of this is simply how can summary judgment be granted when there are still material issues of fact? That's the question. And we have a question. Can you tell me about the Giglio-Brady that was accepted by the Fifth Circuit or the Eleventh Circuit? So right now there is a resentencing hearing. The underlying criminal case is not concluded. There are still pending issues. You have at least five glaring factual inconsistencies between the two cases. And collateral estoppel requires identical, not identical results, but identical facts. I want to know what happened, what is before, what was triggered the resentencing in the Eleventh Circuit. I'm sorry. I didn't understand the question. You said there was resentencing on the Brady and the Giglio. It's pending still. It's still pending still. But I want to know what it is. You're not telling me. Well, the resentencing was based on the calculation of damages and the time that was going to be served. It wasn't on the underlying conviction, if that's your question. Well, that's right. So it has nothing to do with the Brady and Giglio. You're correct, Your Honor. I was stating that there are glaring differences between the two cases which prevent collateral estoppel. I mean, I can't get around, and the Court shouldn't be able to get around, the requirement for a collateral estoppel position which is identical factual issues, not identical results. But they have to be identical material factual issues, ones that are determinative of the liability. And that's what I want you to tell me about, and you're not doing it. All right. So the identical factual issues and materials are different. You have to see it any other way than there's a purchase order in one, there's not a purchase order in the other. Why does it matter to the ultimate conclusion that he, in this instance, had a criminal mail fraud and wire fraud in this instance, whether he's guilty of a 10p-5 and Rule 17 and so on? Because the due process requires, gives the right to Mr. Stein to have those issues considered by a jury. And if there are different issues based on different facts, the conclusion should be that even if it's a mere possibility, that there will be a different result. You can't say in one breath, okay, we don't have a contract, that's fraud. And then in another breath say, hey, we do have a contract, that's fraud. Sotomayor What about Judge Callahan's red and blue shirts? In other words, if this is just a question of whether it's a red or a blue shirt and it doesn't matter to the outcome of either case, you need to tell me why it matters to the outcome of either case. In the outcome of this case, the jury would have been able to hear in a civil proceeding actual testimony from Mr. Tribune that he did write a check, he did purchase materials, he did expect them to be delivered, they were delivered, and that he did sign the contract. That's totally opposite. And then, according to the facts in the other case, he added, he made up that there was a CHM company and then sent somebody to Japan to say, change the answer to the address of the CHM company, and then made believe that the first guy didn't go forward with the actual purchases, and therefore, in order to show the purchases, he had to make up the whole rest of the story. Why does it matter that you began with an actual order if you did, if the actual order never went forward? What difference does that make to anything? That's a call for the jury to make. The issue is, is there material facts that are different? That's what summary judgment is. Kagan. But what's material about it when the question is whether he made up a purchase that didn't happen, and according to your story in the civil case and the story in the other case, after the $50,000 deposit was — went bad, he made it up. So what difference does it make? Well, that's not correct, Your Honor. It was not made up. Mr. Tribune testified in an interview with the SEC that he did purchase them, he did receive them, he was making payments, and it wasn't made up for a made-up company. It was a company that Mr. Tribune himself created. It's in their SEC interview. That was not available to Mr. Stein at the criminal case. Had it been available to him on these documents, he could have done something with them. Well, then that should be used to attack the criminal conviction. But short of that, I mean, I suppose you could say, well, we shouldn't be deciding this until — is there a 2255 going forward in — or likely to go forward in the Eleventh Circuit? There is a petition for cert to the Supreme Court that's been delayed based on the resentencing. It wasn't delayed. It was denied. I thought it was — I think it was delayed and they were waiting to hear. Denied. It was denied. I mean, you should at least know what you're talking about. I'm not handling that case, so I don't know the answer to that question specifically. But in this case, again, Judge, this is a simple analysis of the collateral estoppel argument. The Court has to look at the identical facts, not the same result. If the facts are different, they can't use it. And here, the SEC clearly made a totally different representation. Could have amended it at any time, and they even said their intent all along was to use collateral estoppel after the conviction. I have a sense that there may be something in the collateral estoppel problem, but you're sure not getting at it. All I can do, Judge, is present the evidence that's in front of the Court and from the record. The record shows what the case law supports. We're simply asking for a reversal of the summary judgment motion. It's not based on the correct application of the law. I had reserved some time, and I'm getting into that right now. Thank you, Your Honor. I will give you some time, Your Honor. May it please the Court, I'm Alan Caputi — oops, sorry. I'm Alan Caputi for the United States Securities and Exchange Commission. With me today are Ken Donnelly and Derrick Benson, who handle these cases in the district court for the United States, for the Supreme — for the SEC. And cert was denied, right? Cert — Mr. Stein's petition for certiorari was denied, yes, Your Honor. Is there a pending 2255? No, because the — Excuse me? The sentencing isn't over, so there is no 2255 pending. Is there a pending 2255? Habeas. No, there's not a habeas. There is a pending FOIA case, is that right? There — the FOIA case, what was decided in the FOIA case is that the documents that the SEC made available to Mr. Stein during its case, those documents are now not available to Mr. Stein. So the United States — so the SEC was required to make them available. So the case has been remanded for the SEC to make the documents available. Because he's not at Har-Tronics anymore, is that why? He — I think it's because the SEC made them available, but for a certain amount of time. I see. Okay. Okay. What's also pending in the Eleventh — in the Eleventh Circuit is the issue of the amount of losses, the losses to investors, because that factors into the sentencing guidelines. But the Court has affirmed the conviction, and so we're — All right. So what about my basic question, which is, I gather the — the — the — what went to the jury in the criminal case did not depend on it finding that any particular one of these purchase orders was fraudulent. That is right, Your Honor. It was a general verdict as requested by the defendant. The commission — Did they have to find at least one of them was — Excuse me? Did they have to find that at least one of them was fraudulent? Well, Your Honor, if you look at counts 5, 6, and 7, those three counts relate to different purchase orders. He was found liable on three counts. Each one of them relates to one of the purchase orders. So all three purchase orders, the jury found them liable. I see. I have for you the evidence of the particular documents that are described in the counts, if you'd like to see them. So — I looked at it. It was hard to figure out, because they're talking about mail and wire frauds. You're talking — That's right. You're not — and dates and — and so on. So I — So what happens is the security counts, the securities fraud counts are based on the offer of securities, fraudulent securities. The mail fraud counts are based on the mailing of stock certificates. But the wire fraud counts are based on fictitious material, fabricated documentation, and each piece of fabricated documentation runs to a different — a different purchase order. Well, your brief was not helpful on this. Excuse me? Your brief was not helpful on this, because you didn't do that in the brief. I did not do that in the brief, Your Honor. It would be helpful to me, and perhaps then we could get a response to — to try and match up what was actually found specifically in the criminal case and what was necessary to the result in the civil case. I have — no one's done that for us. Okay. Well, maybe it would help. But there's a case out of this circuit called Inree-Westgate, the town of — Inree-Westgate, the town of Westgate. And that is a 1981 case. It's 642 F. 2nd 1174. In that case, it said that collateral estoppel — the application of collateral estoppel is not impaired if there are — if the judge's holding was based on an alternative holding. In this case, the district court judge said that even if the CHM purchase order were not real, then you still have the other two purchase orders. And I believe that — My question is, is that the case particularly with regard — I know he said it, but I want to test it, because in particular, it doesn't matter to the disgorgement and fines. In other words, was the amount of disgorgement and fines dependent on there being three different incidents? I can't tell that. No, the fines were based — the — the disgorgement amount was based on the amount that he actually received, the amount of disgorgement that he actually received from the sale of the — of the — of the stock. So it was based on — And it would have been the same if there were only two phony deals instead of three? Yes. It would have been the same. It would have been the same. And, yes, it would have been the same. All right. So, but you said — you filed both of these actions — well, they were — they were going on parallel tracks, right? They were going on parallel. But the civil one waited for the criminal to finish. That's right, Your Honor. So I'm gathering — you didn't say this exactly, but you said that counsel for Mr. Stein wanted general verdicts, and what you're saying is that they knew of the civil enforcement action when the criminal trial was going on, right? Well, they had to. I may have confused the two cases, Your Honor. I think I did confuse the two cases. There was a specific verdict in this case. There were four — it was — Stein was convicted of 14 counts. How many did you charge him with? In our case, Your Honor? Well, no, in the criminal case. In the criminal — Was he convicted of everything he was charged with? He was convicted of everything he charged with. There were 14 counts. There was one count of obstruction of justice, three counts for — Well, I think what — I think what Judge Berzon is saying, like my law clerk made me a chart of what are the elements of everything that you're convicted of and what do you have to prove in the civil enforcement action that you're basing the collateral estoppel on, I mean, that would be the least that you could have done in your brief so that we don't have to go and dig through and do all of that. You know, I think this brief, what we do in our brief is we're applying — we're applying the elements of collateral estoppel, Your Honor, but it's — Yes, in a completely superficial fashion, because, in fact, there does have to be a match-up of something that was found to everything that's material in the civil case. And we can't — and I would love to see the charge that Judge Callahan has, because you're sure it didn't provide them. Your Honor, as to — Like, if you were convicted of robbery of a convenience store, that would not — you can't — collateral estoppel would not apply to the enforcement action. I don't understand the question. Well, if it's a completely different charge and the offense — Yes. And there's no match-up. Yes. And so the match-up is important. But, Your Honor, they did match-up here. Well, and that's all that we ask you to do, is since you want collateral estoppel, match them up. Right. What are the elements of the criminal offenses that necessarily follow that what you in the civil enforcement action why collateral estoppel applies? Your Honor, we spelled out in our brief what the elements are for 10b-5, and we showed how the jury instructions match that up, and how our complaint, our — But not on an incident-by-incident basis. That's the problem. In other words, there are specific allegations in the civil case. I — well, let's take, for example, what he's complaining about. He is complaining that there was a specific allegation in the civil case that this guy, Trubeau, Your Honor, if you would like me to explain, I'll explain. Go ahead. Okay. This whole — it all boils down to a check that Mr. Trubeau wrote, okay, and a purchase order that Mr. Trubeau signed, okay? That purchase order was not part of the criminal case. There were three purchase orders that were part of the criminal case. The first one was a CHM purchase order. The second two had to do with a company called IT Healthcare. Now — Well, I thought the first — just a minute. I thought the first one was, in fact, signed by Mr. Trubeau or whatever his name is, but said CHM, and he says I didn't write that in. Okay. Your Honor, in order to create the CHM purchase order, Mr. Stein or somebody working for Mr. Stein took that purchase order, put CHM on it. Right. I understand. All right. So I understood all that. Now, suppose that — is it possible — this is what I don't understand because you've never really broken it out — that the jury in the criminal case didn't find that, in fact, that CHM one was fraudulent. You're now saying, no, it isn't possible because it was the subject of a separate count. Count 5 goes to CHM, I believe, Your Honor. Okay. That's not possible. And then I understood that — so therefore, you would also say that it doesn't  That purchase order was canceled, the Trubeau purchase order was canceled. It was — it was — they used that to make the CHM purchase order, and then they took the check, Trubeau check, and they put the number of the phony purchase order on the check, which is why the check, which is at issue. Okay. Is that — is that how it's alleged in the civil case? Yes. And that is how it is — that is how — but what is alleged, what is alleged is that all three purchase orders were fraudulent. All three purchase orders were fabricated. And that is what the Eleventh Circuit found, that all — all these purchase orders were fabricated, and that fact that — that Mr. Stein managed to get Mr. Trubeau's signature on a check, and Mr. Trubeau's signature on a purchase order doesn't mean anything, it's meaningless. So, okay. So the — the government proved that Stein invented the names of the individuals or in connection with three allegedly fraudulent purchase orders in order to tout the company's prospects, right? Right. And then in the civil, the SEC, it — it seemed that you tacitly acknowledged that at least two of these purchasers might exist, but that they are not the actual signatories on the purchase order documents? Is that true? No. What we alleged in paragraph 40 is that Mr. Trubeau signed a purchase order and that Mr. Trubeau signed a check. What we allege in paragraph 42 is that the — the company that's at issue here, Cardiac Health Care Management, CHM, was a fictitious company.  It's purchased orders with fictitious companies and that is what the Justice Department proved to the jury in the Southern District of Florida. Okay. So a couple of the things. Is there a dispute here about the aiding and abetting? No, he isn't — he hasn't — he hasn't — he has not challenged aiding and abetting in his brief. He — he has — he has talked almost exclusively about the CHM purchase order, which relates — which relates to the — I thought he did raise it at least. It relates — I found it a little surprising that you could be liable for aiding and abetting yourself, essentially. I mean — Well, I believe what he's saying is that if he's not liable for fraud, he's not liable for aiding and abetting. Right. But aiding and abetting is based on attributing what he did to Horatronics and then saying that he's helping the principal of Horatronics. But Horatronics, that seems flimsy to me in terms of — Well, it was his fraud that was reflected in the company's books and records. Right. It was his fraud that was — that was touted in filings with the SEC, Your Honor, in the 10 days. These phony purchase orders were written up and touted in SEC filings. Okay. I understand. So then you're attributing what he did to Horatronics, making Horatronics the principal, and saying he's aiding and abetting Horatronics. That's right. But there doesn't seem to be — the principal doesn't seem to be independent of him. It is him for this purpose. The only thing the principal did — so what I want to know is, does this matter? What is the relevance of the aiding and abetting judgment to anything? I think it may — it may relate to the — to the remedies, which he has. Is it related to the remedies? It might relate to the remedies, yes. I mean, you know, I assume that given the fact that he's been found liable for scientific fraud, that's probably all you need for the penalty and so forth. But it may be redundant. Okay. Well, if it's not redundant, I think it's quite questionable. So it would be — I wish you'd told me that. But I think he was — he said that he was counsel for the company. He was — But don't you have to have the existence of an independent primary violation, independent of what he did, for him to aid and abet it? Yes. But he — But you don't, because the only thing that's being attributed to the — the only primary violation was what he did. Your Honor, his scienter, as an officer of the company, is attributable to the company. Fine. Okay. But that's not independent of him. So now if he's going to aid and abet himself — No. No. He aid and abet the company because he's a principal of the company, and his scienter is attributable to the company. His — his actions resulted in the company filing false documents. And his actions resulted in the company being liable for scienter fraud. So as far as — Okay. You're out of time. Thank you very much. Okay. Well, thank you, Your Honor. Thank you. Well, if we want you to be more specific, we might ask for a supplemental briefing, but we'll see, because it really wasn't helpful to not have this spelled out as to what the — how the pieces fit together. I think we did — we did take the — Your Honor, we did take the indictment and we did carefully parse the indictment out in parts and relate it to facts. If you were coaching a young lawyer and the court told you that you didn't do something, would you then tell the lawyer to say — Oh, you're right. You're correct, Your Honor. Okay. Thanks. I absolutely agree. All right. I'm sorry to argue. Well, maybe I'm wrong, but we both seem to think so. Well, you — There was a hole there. Maybe after all these years, I learned a lot in the court. Okay. Thank you. All right. Thank you very much. Thank you, Your Honor. We'll see you back shortly. Just to be real brief, I would like to address the collateral estoppel. And hopefully, I'm helping the court. I seem to be maybe confusing the court on the issue. Mr. Caputti just said something that is incorrect. The civil complaint specifically alleged in paragraph 40, the existence of agreements, contracts, and checks, which the DOJ and their prosecution argued in closing were false, made up, and never occurred. Witnesses that the civil complaint alleges exist were alleged to be fictitional characters of stories made up to not even be present. Hull, for example. Excuse me? Hull, for example. Yossi Karat. The civil complaint says he existed? The civil — the discovery in the civil complaint yields interviews — The discovery you want to do, but not the complaint. We found some discovery post-conviction that shows that Yossi Karat is an individual, and the SEC knew about him as an individual. So the elements that require them to prove who did what are false. But that's a different matter, right? That's essentially saying — that's your other argument, which you haven't made here, which is that there was something fraudulent about the conviction, or there was a Brady violation or a Giglio violation or something. I can't make that in the civil matter. I can make it in the criminal case. But you can make it as to why the collateral estoppel shouldn't apply, but you haven't been arguing that here. No, have not. No. So the collateral estoppel rule, I think, is blanketed in this case based on separate fact patterns. Even if the convictions are based — are the same elements, they can't prove them if they have different facts. And there's different victims in both cases. The civil case is more of a public victim based on short-selling and naked short-selling, whereas the victim in the criminal case was individual victims based on — a term to be false representations or agreements that didn't exist. So if the elements are totally in opposite of one another, there can't possibly be the same conviction based on different criminal elements, different allegations, and different factual allegations. That's why when a defendant is used as a collateral estoppel, the Supreme Court said that that's an unfair application of that doctrine. And it's clear that the identical requirement has not been met by the civil remedy through the SEC. They said all along, we're just going to rely on collateral estoppel. They did no discovery, didn't provide discovery, and ultimately they didn't even — they could have amended the pleadings and eliminated it. They presume one thing, which turned out to be totally in opposite of what the DOJ argued at trial. I think the law is clear, and we would ask the court to simply reverse and remand this so that a jury trial can go on the merits of the case, as should have been required by the court at the outset. Thank you. Thank you. Case of SEC v. Stein is submitted, and we'll go to SEC v. Gold. Good morning, Your Honors. May it please the Court, Stephen Blum for Appellant Mr. Galt, who's in the courtroom today. I thought that I would try to add a little perspective beyond what's in the briefs, because I think that we briefed it — I hope we briefed it thoroughly and adequately. It occurs to me that what is going on here is quasi-criminal in nature. There is a punishment in effect. There is a fine or disgorgement penalty that is non-dischargeable in bankruptcy. These are potentially life-altering punishments for misdevelopment. In this case, the jury found there was no fraud by Mr. Galt. So on what basis could it find negligence? Wasn't one of the things that found a fraud? Pardon me? Although, for the most part, that's true. I thought one of the things they did find was a fraud based. Is that not right? I believe that what they found was negligent participation in a fraud. I see. And so since they did not find fraud as fraud, they nonetheless found negligent participation. Let's start with the procedural problem, because there is one with regard to whether we reach the sufficiency questions on two of the three counts that he was convicted of. In other words, you didn't make a 50A motion. You made a Rule 59 motion, as I understand it, but then you haven't appealed the denial of the 59 motion. So what are we supposed to do with all this? Well, I think that we find that there is not sufficient evidence. How do we do that if there wasn't a 50B motion? A 50A motion. I'm sorry. Our law is really tough on this. It's really tough. I've dealt with it in several cases. Whether it makes sense or not, it is really tough. There's, you know, the record is what it is, and there is a But you didn't appeal the 59 motion, which you could have. But you didn't. I'm not sure. I'm not sure that that's, if that's, I'm not prepared to address that. I don't know the answer. All right. Well, it's a central problem in the whole case, and there's not a whole lot of point in arguing about the sufficiency questions if we don't have any procedural way to reach them. I do think that the essential issues were addressed in the appeal. I believe that there must be some proof of a breach of a standard of care with respect to the negligent participation in a fraudulent scheme. Mr. Galt, who was at the company for only two months, he's not a lawyer. He's not a CPA. He had no experience in a public company. I believe that it's undisputed that Mr. Galt discharged his obligation by reasonable reliance on the assurance of experts, lawyers and so forth, including a securities lawyer licensed by the State of California. That's undisputed. In the case of Armstrong v. Brookdale University Hospital, Second Circuit. Well, but okay. It's your client. He, you know, he essentially gets convicted of negligently defrauding Kolnick into investing in Hartronics so that he could purchase Hartronics stock with these funds. And he also misled potential investors by negligently signing the false, I don't know if you call it SOX, SOX, whatever, certification for Hartronics 2008 Form 10-Q filing. So, and then he, they convicted him of circumventing internal accounting controls by diverting Kolnick's loan to his private brokerage account and authorizing the purchase of Hartronics security with those funds. So. I don't believe it's appropriate to say that he was convicted of anything. Well, he got convicted of something. He was found. He was found not guilty of everything? Found liable. Liable, we understand that. Okay. But I wouldn't say it was, convicted implies some criminality. We understand that. And I think that it's clear that, but you know, that's part of the problem with this case. There is that quasi-criminal aspect to it. There's that punitive component to it that is unjust in this case, it seems to me. I want to make the point that as a matter of public and corporate governance policy, officers, such as Mr. Galt was for two months only, need to be allowed to reasonably rely on experts such as securities lawyers and CPAs. Mr. Galt is, he was a pitchman, a retired athlete. He had zero experience, zero qualification to be in this role in retrospect. Well, but how sophisticated do you have to be when you take money from someone that's investing in it and you put it into your own brokerage account and use it for your own basis? But it was not used for his own, he did not profit a penny from this. It was not used for his own benefit. The money was used to buy back. I thought he actually sold his stock and put it on his tax return. My understanding is that he made not a dime from this transaction. And that's what the record reflects. Your understanding, but the question is, could a jury find, based on the fact that it was put in his account, it was his stock that was sold, and that he put the proceeds on his tax return, whether he actually then gave it all to Stein and whether he was a dupe. I mean, does that matter ultimately? I mean, I have a certain amount of understanding. I think it does matter. Understanding, I understand that he was, you know, small fish in this whole operation. For sure. He was absolutely duped. And I want to make the point, though, that I understand the point of securities laws is to protect investors. How do you protect investors in a situation like this where, what do you say? Do you say that all officers have to be lawyers or CPAs? Is it not enough for an officer to discharge his obligations by relying? I suppose the response to you is that if he hadn't done this stuff and his negligence was in not knowing things, that would be one thing. But since he did engage in this activity that at least circumvented the usual, I mean, whether or not he made money on it, it was hiding a set of transactions from the ability of people inside the corporation to know about them because it was in this non-corporate, I'm not talking about the bank account, but the fund or the bank's or the stock account. So he knew that, in other words. And at least to that degree, why shouldn't it have been reflected? Why should he be signing a form that says that everything was followed when he knew it wasn't? Certainly he was, whatever he did, the record is very clear on this, I think. Whatever he did, he did at the instruction and request of Mr. Stein and of others who were in the company who knew better. Mr. Galt, unfortunately, he didn't know better. And to make this blanket, he signed a document required to protect investors that he had done the checking necessary that all was in order. And then he testified he didn't know anything about that. So when he signed the document that's to protect investors, he signed a document that he was unaware of, that he had not checked to find out. Now I understand that he was being duped. But that isn't the point, is it? Isn't it the point whether or not he violated a rule that has been used for years to protect investors? That is, what is his excuse? That Mr. Stein was advising him? Is there anything in the record that Mr. Stein came in and talked to him about this particular document and said, we need to have you sign this even though you haven't gone and done it? Is there anything like that? I believe in the briefs there are references to the record establishing that the only evidence is that he relied on the advice and, in fact, insistence of professional people within the company. Whether it was Mr. Stein personally at any given moment, I can't say without going back and looking at the record, but there are the references in the record to who told him what to do at which point in time. And I do believe... The record does show that he admitted he did not know anything about what he signed he had checked on and it's valid. But what he did do, Your Honor, is he relied on people who were in a position to know and who were in a position to advise him, securities, including a securities lawyer, including Mr. Stein, who was a licensed lawyer. But the problem, isn't the problem that the people who are advising him, leaving off Stein, didn't have the information that he had about this off-books transaction? Well, I don't know that that's true at all. I know that Mr. Kalanick, for example, who was the alleged victim here, who, it seems to me, was participating in some sort of pump and dump. Is he one of the people who told him to sign this thing? He... Who advised him to sign the document? Who advised him to sign the document? Well, I can't say specifically. I thought it was Woodbury and maybe Harrison, somebody. I think that's... All right. Well, the whole problem here, as I understand it, is that whether or not Kalanick was duped, which I agree with you is a little questionable, and whether or not Mr. Galt made any money, the fact is that he did know that there was an off-books transaction going on. That... Right? And that Woodbury and Harrison, therefore, didn't know about it because it was going on in this stock account of his, whether he made money on it or didn't make money on it. So the fact that they advised him to sign it as to whether the internal systems were followed can't work very well because he knew something that, I gather, the whole problem was they didn't. But he would have to know the significance of it. Why would he have to know the significance of it? Why wouldn't he just have to know that, in fact, there was this off-books stuff going on? I don't know. I know that everything that he did, he did at the request and on the advice of professional people. And I think that's... But if they don't have the information, then it doesn't matter. I mean, if he had gone to the professionals and said, you know, they're asking me if all our internal systems are being followed, are they? And they said, yes. That would be one thing if he didn't know they weren't. Well, it certainly wasn't his idea to put the money in this. Whose idea it was doesn't matter. The point is he knew that it wasn't happening, that this other thing was happening. I mean, that's the problem, I think. What about the Smith's expert testimony? I thought excluding him was extremely questionable. Does it make any difference? Well, I think it establishes that there was no damage to or harm to anyone. And... Well, it doesn't establish anything. It establishes his opinion as to what a reasonable investor would think. But why aren't the... Isn't the jury reasonable, able to determine that for itself? Well, juries aren't necessarily composed of reasonable investors. I mean, juries know more about investment than I do. I mean... No, I think the exclusion of Dr. Smith's testimony and the allowance of Mr. Stein's testimony are both questionable and prejudiced. Well, the Stein question... The problem with the Stein thing is that the instructions were perfectly clear as to what that went to, and it wasn't... It was only Stein's liability as a principal. That is all. And not to Mr. And I understand he mentioned Mr. Gault several times, although not in the sentences you put in your brief. But he did mention Mr. Gault. But, I mean, unless you're making some... Basically suggesting that it was simply too prejudicial, despite the fact that the jury was told not to use it against Mr. Gault, which they were. So what do you say about that? The jury was told not to use it against Mr. Gault, except for the purpose of proving that Mr. Stein was a culpable principal. But Mr. Gault is the one who suffered in the end from this. I mean, was Mr. Stein on trial at that point? The law says if the jury... If the judge gives a limiting instruction, that it's presumed to be followed. And a limiting instruction was given. So isn't that a problem for you? Yes, it is. Well, I think that it was prejudicial. And I think that it goes to another issue, which is whether the government's lawyers ought to have put forth that evidence. It was within their discretion to do that. And I suggest that that may be some, if you will, prosecutorial misconduct. All right. I see I'm out of time. Thank you. Your time is up. We'll give you a couple minutes to rebuttal. Thank you. May it please the Court, I'm Alan Caputti for the United States Securities and Exchange Commission again. Your Honor, I want to apologize if in the previous case I did anything that was in any way disrespectful or... No, it wasn't disrespectful. Okay. I've looked back at the brief now. And you don't mention those things. You go through count seven and you say generally what was in it. Anyway, let's do this case. Your Honor, Mr. Gault was found liable by a jury of his peers in the Central District of Florida for three serious violations of the federal securities laws. First one is fraud under 17A3. The second is knowing... So this was a negligence? Negligent fraud, Your Honor. That seems like a contradiction to me. I understand that. Yes, I understand. It does sound weird, but 17A3, unlike 17A1, focuses on the results, the effect of a conduct. Did the conduct operate as a fraud? 17A1, on the other hand, focuses on the mental state. And that's the difference between the two. In any event, he was found liable for fraud under 17A3. He was found liable for knowingly evading internal controls under 13B5. And then he was found liable for also filing a false SOX certification under Rule 13-14. There is not really... What happened here basically is that he was hired by Mr. Stein as a pitchman. Later on, after being hired as a pitchman, he actually agreed to become an officer and director of the company and then CEO of the company, despite the fact that he admits that he really didn't know anything about the responsibilities of an officer or director under the federal securities laws. So, I mean, there is a flavor about this case. It does appear that he was being used. And I don't quite know why you went forward with him, but let's leave that aside. Go ahead. Your Honor, people can't go out and use a trusted name and tell celebrities and tell people that, put your money in this stock. I mean, that's a problem that we have. Anybody who knows who reads... But that's not what he was prosecuted for. Hmm? That's not what he was prosecuted for. He was prosecuted for... He was prosecuted for... I mean, not prosecuted, but whatever. He was prosecuted for deceiving Mr. Kolnick as to how his money... He doesn't seem all that deceived, frankly. It doesn't... Well... He doesn't seem like he was the good guy here. Mr. Kolnick? Yeah. He stayed after all this happened and continued to work with the company for quite a while after he claimed that he lost all his money. Yes, because it's a financially distressed company. He had an investment in it. When you invest in a financially distressed company, you put in your two cents, you buy your two cents of stock, and you're hoping eventually it's worth $20 a share. Right. And after he lost all the money, he claims to have been... Now claims that he was defrauded and didn't realize it was being used for stocks, even though the original e-mail said stocks. He still stayed in the company. Now, the e-mail that's in question here that you're talking about said stock buys, referred to stock buys. Stock buys is Mr. Kolnick's previous purchases of stock. He said it was $100,000 for operating expenses. That's right. Stock buys. That's right. And stock buys. No. Buybacks is something different. When buyback means that you're taking money and you're buying the company's stock back. Stock buys means buying... Buying stock. That he, Mr. Kolnick, is buying stock for the company. That's something different. In any event, there's not much here really for the court to decide, because as the court has already indicated, Mr. Galt has waived his right to challenge the sufficiency of the evidence, and then in his opening briefs he did not ask for a new trial. Nevertheless, the evidence in this case does overwhelmingly support the verdict of the jury. As to the 13A3 claim, Mr. Stein... Mr. Galt, I'm sorry, Your Honor. Mr. Galt signed a false stock certification, certifying as to the adequacy of the company's internal controls. When he admits, when he testified, he did not know what internal controls were. The standard is negligence. That is per se negligent. Negligence. He even says that, I didn't read the stock certification carefully. Again, this is per se negligence, Your Honor. So he was, well, he was not found liable on some of the claims, right? Scientifraud. The ones that required scientifraud. He was not found liable for scientifraud. It may be that the jury bought his claim that he relied on others, but as the jury was instructed, that could only, reliance could only be used to lower the mental state from scientifraud to negligence. And that might be how the jury arrived at it. They may have said, well, he was a dupe, but he was a negligent dupe. That may be what happened here, Your Honor. As to the 13B5 claim, the claim of knowingly evading internal controls, Mr. Galt admits, he admitted that he deliberately, he consciously deliberately, this is what he testified to, consciously deliberately did not provide the CFO of the company with information that he needed in order to make accurate company books and records. That, the money in question there was Mr. Kolenick's $150,000 investment. As to the one claim that does, that is properly before the court, the Rule 13A-14 claim, Mr. Galt argues that the SEC does not have an independent cause of action. Actually, that argument was rejected in SEC versus Jensen recently. And in SEC versus Jensen, it was found, the court also decided that in order, when you're reliable under 13, you're reliable under 13A-14 if you sign a SOX certification without a sufficient basis to believe in its accuracy. Here again, Mr. Stein, Mr. Galt rather, Mr. Galt signed the SOX certification. Well, what about consultation? I mean, if you, I'm sorry, if you go to, let's suppose you go to the firm CPA and the firm's lawyer and the firm's chief financial officer and you say, is everything on the up and up? And they say, yes, is that sufficient to sign the document? Well, not when he knows that everything is not on the up and up. Well, that's what I was saying earlier. But as to reliance on experts, ordinarily you can do it. Is that right? I mean, the way you just described Jensen would suggest that you can't. You have to sit there by yourself and go investigating whether or not the internal controls were operating or not. Your Honor, he signed the SOX certification without knowing what internal controls were. And the SOX certification, and the SOX certification knew a test, that internal controls are adequate. All right, but I'm asking you just conceptually, what does the person have to know as to whether the internal controls are adequate? Can he know that all the experts tell him they're adequate? As the jury was instructed in this case, reliance on others could only lower the mental state from scienter to negligence. That's all reliance on others does. But I'm just asking a very straightforward question. I'm sorry, I'm not interested. The straightforward question is, is it negligent for a non-expert? I mean, does everybody who's a CEO have to be an expert on accounting, internal accounting? Presumably no. He doesn't have to be. Right? So is it negligent if he goes to the accountant and says are all our internal controls operating? And then he's told yes and he signs yes? Is that negligent? Yes, it would be negligent. No, it wouldn't always be negligent. It might not be negligent and a jury could find you not liable under certain circumstances. I realize that you're clinging to the facts of this case of why, and that's a whole different thing. But hypothetically, if the jury had believed him that he was just totally reliant on experts, had given the experts all of the information or whatever, they could have found him not liable. They could have found him not liable. So it isn't necessarily follow, because you rely on an expert, you're not negligent, but it can follow that relying on an expert can be enough under the facts of certain circumstances, right? That's possible, Your Honor. But legally speaking, it's supposed to, the jury was instructed that it could be used to lower the mental state from scientific to negligent. But then they were told what negligence was. Yes. And they could have found that he wasn't negligent. Your Honor, a prudent CEO. In other words, the fact that he doesn't know what an internal control is, whatever that means, doesn't seem to me to be the important point here. What's the important point is that he knew something specific that he knew the people he was asking didn't know. And that's a different point. Yes. But a CEO has an obligation to know. He has to know. An officer, a director, or a CEO has to know what the responsibilities under the Federal Securities Law are of an officer, a director, or a CEO. And one of those is to know what internal control is. Enough to ask an expert whether we have them. Your Honor, he can't say that he doesn't, he can't say that internal controls are adequate when he's actually taking money. Right. That's a different point. That's what Judge Callahan was saying. But there's no point in over-arguing your case because we have to have a set of rules that make sense. And it seems to me that it has to make sense that a CEO does not have to be an accountant. And it has better things to do than to go look to see whether, in any detail, that the accountant's doing what he was supposed to be doing, rather than just asking the accountant. A CEO has an obligation to act prudently. And he didn't act prudently here. When he is signing a SOC certification that says what internal controls are, and he doesn't, it says what, it says internal. What about the Smith doctor, the Smith expert? The Smith. I looked at what he, I didn't, it seemed to me that what was said about his declaration was just not so. He used the totality of circumstances. And he was, the reason he was concentrating on value is because that's what the relevant question is. The relevant question is, ultimately, whether anybody would have thought that what happened here affected the value or didn't affect the value. Now, so to me, the question really is harmless error with respect to the Smith declaration, or whether there was an alternative ground for not admitting it, which is that it wasn't going to be helpful to the jury. Your Honor, the Smith declaration went to the, went to the question of materiality. And what is material, is what is material, is anything that would cause an investor to decide or not to decide, and you, to buy a security, and you look at the total mix of information, he was applying a different standard of materiality. He was applying a, not looking at the totality. I have been asked to opine as to whether any disclosures related to the Kolnick loan admitted information that would have significantly altered the total mix of information available to investors. Total value-added information. No, I just read you what it said. It didn't say that. But that's what he... And, or in other words, whether further disclosures related to the purpose or use of the Kolnick loan beyond the company's disclosures would have provided market participants with significant new information relevant to assessing the value of the company or its securities. And why isn't that the question? Your Honor, you're investing in penny stocks, okay? These are all going to be companies that have got financially insecure in one way or another. They're startup companies. They're companies that are financially distressed. What would have mattered to investors that would have been very significant to them is if they knew that internal controls weren't in place. Internal controls making certain... Oh, that would be new information relevant to assessing the value of the company or its securities, would it not? Well, that... But he did not know... He didn't know... Professor Smith didn't know what internal controls were. He didn't know what the legal significance was of signing a stock certification. How do we know that? Hmm? Why do you say that? Because that's what the judge found. That's what the district court judge found. The district court judge found... Well, I thought he found that he didn't apply the totality of the circumstances standard even though he said he did. I think there were four grounds, actually. He found that the use of the materiality standard, that the report would have confused the jury, essentially. Also found that... Why don't you start with what's a standard of review when you don't let an expert testify? What is the standard of review? I believe it's an abuse of discretion. Right. Right. Which is a standard that's fairly favorable to you. Right. But... So why didn't the judge abuse his discretion? Why was this not an abuse of discretion? It was not an abuse of discretion because it would have confused the jury because the expert was not qualified to testify. All right. You don't want to make a harmless error argument. Excuse me? You do not want to make a harmless error argument. Yes, Your Honor. I'm confusing the two cases now. I believe that the... I don't think that he was found liable on that particular element, on that particular claim that Smith's... report would have gone to. That's possible. I don't know. All right. Your time is up. Thank you very much. Thank you very much. Well, Your Honors, just momentarily, the off-the-books issue that the court was interested in, it looks to me, from looking at the record and our brief at pages 30 to 31, that there's plenty of evidence that Mr. Stein told Mr. Galt what to do with respect to that and to open the account. Well, so what? He still knew it happened. Sorry? I don't know why that matters. Well, I think it matters because... As to the signature question, because he still knew about it. Because the signature is based on Mr. Galt being told by experts that it's okay to do it. But experts who didn't know about it. Well, Mr. Stein certainly knew about it. But he wasn't one of the experts. Well, Mr. Stein was an attorney. He was Mr. Galt's attorney. Did Mr. Stein tell him to sign it? You said no. Pardon me? You earlier said that it wasn't Mr. Stein who told him to sign it. Well, I was... I'm looking here, and it's... Did you write the brief? Pardon me? Did you write the brief? I co-wrote the brief. Okay. But what I'm saying is that I think that there's evidence in the record that Mr. Stein is a lawyer, that Mr. Stein was Mr. Galt's lawyer, that Mr. Stein was running the company, and that Mr. Stein said, go ahead and do this, and that Mr. Stein was... So if Mr. Stein told him to go kill someone, would he be able to rely on that? No, because... Because Mr. Stein's a lawyer, and if a lawyer tells you to go kill someone, they know the law? No, because that would not be reasonable reliance. Here, I think it's reasonable reliance. Okay. And that's the issue. All right. Thank you. So your time is up. Thank you all. The case of Security and Exchange Commission v. Galt is submitted, and we'll go to the last case of the day, Cusnanto v. Sessions.
judges: Wallace, Berzon, Callahan